UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
EASTERN DIVISION

| | |
|---|---|
| JULIE A. SU,<br>Acting Secretary of Labor,<br>United States Department of Labor, | )<br>)<br>) |
| Plaintiff, | )<br>)<br>) |
| v. | ) Case No. 1:24-cv-01038-STA-jay<br>) |
| TOSH PORK, LLC and<br>DIANNA ROSA, | )<br>)<br>) |
| Defendants. | ) |

**ORDER DENYING MOTION FOR
TEMPORARY RESTRAINING ORDER/ PRELIMINARY INJUNCTION**

This matter is before the Court on Plaintiff's motion for temporary restraining order/preliminary injunction. (ECF No. 9.) Plaintiff seeks an order enjoining Defendants Tosh Pork, LLC and Dianna Rosa, their agents, servants, employees, and all persons in active concert or participation with them from violating the provisions of § 15(a)(3) of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 215(a)(3), by retaliating against current and/or former employees who provide information or complain to the U.S. Department of Labor ("DOL") about their wages. Defendants filed a written response opposing the motion on March 18, 2024. (ECF No. 18.) A hearing was held on March 19 and April 3, 2024. At the hearings, the testimony of witnesses was presented by both sides, and various exhibits were introduced into evidence. The parties then submitted post-hearing briefs. (ECF Nos. 25, 27.) The Court, having considered the evidence presented at the hearings, the arguments of counsel, the relevant case law, and the entire record,

finds that Plaintiff's motion should be **DENIIED**.[1]

Under Rule 65 of the Federal Rules of Civil Procedure, the Court must consider four factors when ruling on a motion for preliminary injunction: "(1) whether the movant has shown a strong likelihood of success on the merits; (2) whether the movant will suffer irreparable harm if the injunction is not issued; (3) whether the issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuing the injunction." *Overstreet v. Lexington-Fayette Urban County Government*, 305 F.3d 566, 573 (6th Cir. 2002) (citations omitted). "A preliminary injunction is an extraordinary remedy which should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it." *Id.* Moreover,

> Plaintiffs seeking a preliminary injunction may not merely rely on unsupported allegations, but rather must come forward with more than "scant evidence" to substantiate their allegations. *See*, *e.g.*, *Libertarian Party of Ohio v. Husted*, 751 F.3d 403, 417 (6th Cir. 2014); *Cameron v. Bouchard*, 815 F. App'x 978, 986 (6th Cir. 2020) (vacating preliminary injunction when plaintiffs made no evidentiary showing on some elements of their claim, but instead made mere allegations regarding the treatment of Covid-19 in prisons); *McNeilly v. Land*, 684 F.3d 611, 614 (6th Cir. 2012) (upholding denial of preliminary injunction when plaintiff made only a "small showing" of evidence); *United States v. Certain Land Situated in City of Detroit*, No. 95-1118, 1996 WL 26915, *1 n.1 (6th Cir. Jan. 23, 1996) (noting a lack of evidence to support speculative allegations); *Boulding v. Corr. Med. Servs.*, No. 1:06-CV-811, 2008 WL 2095390, at *1 (W.D. Mich. Feb. 11, 2008), *report and recommendation adopted*, No. 1:06-CV-811, 2008 WL 2095387 (W.D. Mich. May 15, 2008) ("Plaintiff did not marshal any evidence in support of his motion [for a preliminary injunction]. Plaintiff's unsupported allegations do not suffice." (citations omitted)).

*Mendy v. Adams*, 2023 WL 4190532, at *2 (M.D. Tenn. June 25, 2023).

---

[1] Rule 65 permits two different forms of temporary injunctive relief: a temporary restraining order ("TRO") and a preliminary injunction. Because Plaintiff did not comply with Rule 65's requirement for a TRO that its attorney certify "in writing any efforts made to give notice [to Defendants] and the reasons why it should not be required," Fed. R. Civ. P 65(b), the Court declined to issue a TRO and, instead, set a hearing to determine if the issuance of a preliminary injunction was warranted.

The FLSA provides for equitable relief in a suit brought under its anti-retaliation provisions, 29 U.S.C. §§ 215(a)(3); 216(b).[2] Section 215(a)(3) specifically prohibits retaliatory action against employees who file complaints, pursue actions, or participate in proceedings under the FLSA. *See Walsh v. Z4 Fuels, LLC*, 2022 WL 18587116, at *1 (E.D. Ky. Apr. 8, 2022). Section 217 gives district courts "jurisdiction, for cause shown, to restrain violations of section 215**.**" *Id.*

> "An injunction reinstating employees to their former position and restraining further retaliation fits squarely within the relief available under § 216(b), which allows an employee to obtain, 'without limitation,' equitable relief that is 'appropriate to effectuate the purposes' of the antiretaliation provision." [*Bailey v. Gulf Coast Transp. Inc.*, 280 F.3d 1333, 1335–1336 (11th Cir. 2002)]. A preliminary injunction may be entered because the "antiretaliation provision was meant 'to foster a climate in which compliance with the substantive provisions of the Act would be enhanced' by protecting employees who come forward with complaints." *Id.* at 1337. Thus, when employees have demonstrated a likelihood of success on the merits and satisfied the other requirements for preliminary injunctive relief, "allowing for such relief to put the employee back in the position he held before the employer's retaliatory conduct is consistent with § 216(b) — it is a form of equitable relief that effectuates the purposes of the antiretaliation provision." *Id.*

*Bowman v. New Vision Telecommunications, Inc.*, 2009 WL 5031315, at *13 (M.D. Tenn. Dec. 14, 2009).

---

[2] Section 215(a)(3) makes it unlawful
> to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter, or has testified or is about to testify in any such proceeding, or has served or is about to serve on an industry committee.

Section 216(b) provides, in part,
> Any employer who violates the provisions of section 215(a)(3) or 218d of this title shall be liable for such legal or equitable relief as may be appropriate to effectuate the purposes of section 215(a)(3) or 218d of this title, including without limitation employment, reinstatement, promotion, and the payment of wages lost and an additional equal amount as liquidated damages.

The pleadings, hearing testimony, and record as a whole show that Tosh Pork is a Tennessee limited liability company engaged in the agriculture industry, which includes operating pig farms located in Tennessee.[3] Dianna Rosa is the human resources manager for Tosh Pork. Ma Concepcion "Katy" Cazares and her husband Carlos Villegas are employees of Tosh Pork. Both are H-2A visa workers under the Immigration and Nationality Act, 8 U.S.C. §§ 1101(a)(15)(H)(ii)(a), 1184 (c), and 1188.[4]

As explained in the complaint, the H-2A visa program allows U.S. based employers, who meet certain requirements, to hire workers from other countries to perform agricultural work of a temporary or seasonal nature. 20 C.F.R. Part 655 and 29 C.F.R. Part 501. The "TN visa" is a work visa intended for individuals with professional certifications from Canada and Mexico. 8 C.F.R. § 214.6. This visa allows citizens of Mexico or Canada to work in the United States for a period of three years, subject to extension and renewal. (Cmplt. p. 3, n. 1, 2, ECF No. 1.)  Cazares and Villegas are Mexican nationals who work for Tosh Park pursuant to the TN visa program; as such, they are protected by H-2A regulations because they work in corresponding employment. (*Id.* at p. 4.) Tosh Pork employees come from both Mexico and the United States.

Cazares made a complaint on February 28, 2022, against Tosh Farms[5] regarding the requirements applicable to the employment of H-2A visa workers, including whether workers were

---

[3] The facts are stated for the purpose of deciding this motion only.
[4] Cazares and Villegas testified with the assistance of a Spanish interpreter.
[5] Defendants maintain that Tosh Farms and Tosh Pork are separate and distinct legal entities. Plaintiff has countered that the two entities have common ownership and their business is conducted for the same purpose. The September 2022 complaint was filed against Tosh Farms, whereas the present action is against Tosh Pork. The Court need not decide the relationship between the entities at this juncture. *See Warshak v. United States*, 532 F.3d 521, 537 (6th Cir. 2008) ("The factual record necessary to support a preliminary injunction does not have to be complete.")

4

required to pay for their housing and travel and the poor conditions of their housing. As a result of that complaint, over the course of sixteen to eighteen months, DOL's Wage and Hour Division conducted an investigation, ultimately determining that Tosh Farms had violated the regulations governing the H-2A visa program in several ways. Gary Williams, DOL's investigator, made no finding of retaliation, although he discussed the elements of retaliation with Rosa and Russ Bryant, Tosh's attorney, in August 2023, including giving them a DOL fact sheet explaining prohibited retaliation.

In September 2023, the Wage and Hour Division provided Rosa with a document summarizing the back wages that they had calculated for the affected employees. Cazares and Villegas were two of the five employees on the list. In total, the Wage and Hour Division found that Tosh Farms underpaid five workers by approximately $39,000. The Wage and Hour Division also assessed civil money penalties totaling $36,741 for these violations. Additionally, Tosh made repairs to the housing as required by DOL.

In October 2023, Cazares sent an email to Rosa inquiring about overtime pay. In December 2023, she again emailed Rosa asking her to explain how her pay was being calculated. Rosa testified that she considered Cazares' emails to be "payroll issues" and not wage and hour complaints. As a result of their complaints about extra work hours, Cazares and Villegas were allowed to transfer to another facility where they worked only eight hours a day.[6]

During this same time period, which was during the last quarter of 2023, Cazares and Villegas participated in a group chat with other employees, wherein issues at work were discussed,

---

[6] Cazares and Villegas testified that their new facility was an hour's drive away from where they lived but, according to Cazares, the new facility was "80 per cent fine compared" to their previous facility. Villegas testified that he was offered work "in a different area, lighter work."

5

including issues regarding their pay. Cazares and Villegas deny starting the group chat but do not deny participating in it.

On January 18, 2024, Rosa was informed by Jose Santiago, the Regional Sow Farm Manager that a farm manager, Marcello Gomez, had reported that three employees had made verbal complaints regarding Cazares and Villegas' behavior that was causing stress and disrupting productivity. Rosa instructed Santiago to tell Gomez that the employees would need to file written statements if they wanted to make a formal complaint and have that behavior addressed and stopped. Thereafter, Rosa received written statements from each of the three employees complaining about Cazares and Villegas' behavior. (Hearing Exhibit 12.) The employees complained, in part, that Cazares and Villegas had asked the employees not to show up for work on January 14, 2024. Even though the employees told Cazares and Villegas that they did not want to participate, Cazares and Villegas continued harassing them with the same discussion, according to the letters.

After discussing the matter with Santiago, Rosa determined that the appropriate action would be a documented verbal warning to let Cazares and Villegas know that harassment at work was unacceptable and to tell them to stop harassing their co-workers.

As a result of the three written complaints, Rosa scheduled separate meetings with Cazares and Villegas for January 23, 2024. Two additional Tosh Pork employees, Dr. Seth Krantz, a veterinarian, and Marcelo Gomez, attended the meeting with Cazares. Gomez was Villegas' manager and served as an interpreter (English to Spanish and vice versa).

During the meetings, Cazares and Villegas were given warnings regarding their behavior toward the other employees. The two disciplinary notices, i.e., "Team Member Discipline Notice,"

that the employees received were admitted as evidence at the hearing.[7] (Hearing Exhibits 5 and 6.) These notices were on pre-printed forms and contained boxes to be checked for progressive discipline: documented verbal warning, written warning, final written warning, termination, and other. (*Id.*) The notices given to Cazares and Villegas had the box "documented verbal warning" checked.

The notices indicated that both employees were "creating a disturbance in the workplace" by "badgering" other employees in order to demand better pay/time off and to not show up for work on January 14, 2024. (*Id.*) The disciplinary notice issued to Cazares stated that "further disciplinary action up to and including termination" will be imposed should the incident occur again. (Hearing Exhibit 5.) According to Rosa, this was standard language included on disciplinary notices. Cazares testified that she did not read the document presented to her by Rosa and refused to sign it.

Rosa testified that no mention was made of the prior DOL investigation at the meeting, while Cazares testified that the prior investigation was mentioned. Rosa stated that she did not know that Cazares had made the complaint that led to the prior DOL investigation until this lawsuit was filed. Until that time, Rosa thought the investigation was a random audit of Tosh's practices.

Rosa's handwritten notes from the meeting (Hearing Exhibit 13) were made immediately after the meeting and state that Cazares was told that she must keep a good attitude while at work and not bring the team down. If she continued with negativity, it would result in further discipline, including termination. Cazares responded that she would be professional. According to Rosa, the disciplinary action was taken because Cazares and Villegas were harassing other workers – not because they were complaining about their own pay.

---

[7] These notices were in English and Spanish.

Rosa testified that she was not aware of the group chat going into the disciplinary meetings. Rosa, Dr. Krantz, and a translator later participated in a call with Cazares and clarified that her write up was not associated with the group chat; instead, it was over her harassment of her co-workers that was causing stress in her co-workers and affecting productivity.

Dr. Krantz also testified that Cazares and Villegas were not threatened with termination during the meeting and no mention was made of the DOL investigation.

The disciplinary notice issued to Villegas actually states that "further discipline up to and including **intimidation**" would be imposed should he continue to engage in the offending conduct. (Hearing Exhibit 6, emphasis added.) Rosa testified that the use of the word "intimation" rather than "termination" was a typographical error. She said that the notice was intended to reference termination.

According to Rosa's handwriting notes made immediately after the meeting (Hearing Exhibit 14), Villegas wanted to discuss other topics including his desire for advancement at Tosh. Rosa explained that attitude and ability to get along with others would drive and impact his future opportunities. No mention was made of the prior DOL investigation according to Rosa.

Villegas testified that he had previously obtained a loan from Tosh that had to be repaid with interest. Rosa told him that, if he resigned from his job, he would not be expected to pay back the loan. He further testified that he had never complained about his wages or about overtime.

Although Cazares and Villegas testified at the hearings that they were "threatened with termination" during the meetings, Rosa and Dr. Krantz testified that they were merely told that further infractions could result in discipline including termination – as stated on the printed notices.

Investigator Williams acknowledged at the hearing that it was not improper for an employer to instruct an employee not to badger or harass other employees.

8

After Villegas left the meeting, Gomez directed Villegas to use the tractor to take dead pigs to the compost pile. This was part of his regular job duties. When Villegas got to the tractor, he noticed a decapitated pig head that was sticking out of a white plastic bag in the bucket of the tractor.[8] He does not know how the pig head got there but believes that this was an act meant to intimidate him and that it related to his meeting with Rosa. Villegas documented the incident with his cell phone and reported the incident to management. Villegas testified that he did not think that management took the incident seriously enough. He also testified that he felt unsafe after finding the pig head. Villegas' "workspace" is the area around the hog pens and troughs. He believes that Gomez later disposed of the pig head by burying it.

At the hearing, Roberto Toledo,[9] an employee of Tosh, testified that he placed a pig head in the bucket of the tractor on Monday, January 22, 2024, when he got to work around 6:00 a.m. He said that he was given a pig by the company the previous week as an employee benefit; he took the pig home, slaughtered it, and had a cookout at his house on Saturday, January 20, 2024. He then brought the pig head back to work on Monday, January 22, 2024, to dispose of it because he did not know how to cook the head. He placed the head in the bucket of the tractor so that it could be taken to compost. The pig head was not in a white plastic bag when he put it in the bucket of the tractor on Monday morning, although Villegas testified that, when he found the pig head on Tuesday afternoon, the pig head was in a plastic bag. No one told Toledo to put the head in the tractor bucket. In response to the Court's question if it was customary to put pigs or portions of pigs into the bucket of the tractor on a regular basis, Toledo answered "yes."

---

[8] At times during the hearing, the "tractor bucket" was referred to as the "tractor blade."
[9] Toledo was also referred to as "Hernandez" during the hearing.

Cazares, Villegas, and Investigator Williams all testified that they did not believe that Rosa had put the pig head in the tractor bucket and did not know who had done so. Cazares stated that she had no independent knowledge of anything to do with the severed pig head.

Villegas testified that, after the settlement that resulted from the 2022 complaint, he thought that his manager, Marcella Gomez, became more critical, used a loud voice when communicating with him, and stared at him. Villegas asked Gomez about his wages, and Gomez said that he could not do anything about his wages.

As of the date of the hearings, Cazares and Villegas have not been terminated by Tosh and, even though their hours were reduced, their pay has not been reduced. Cazares testified that she was happy that her hours had been reduced with no reduction in pay. She also testified that Tosh has never stopped her from contacting DOL or from taking a day off to assist with DOL's investigation.

DOL opened a second investigation against Tosh in February 2024 for alleged retaliation against Cazares and Villegas. This investigation is on-going. At the time of the hearings, there was no ongoing investigation as to the alleged failure to pay overtime to Cazares and Villegas.

Both the motion for a TRO/preliminary injunction and a press release issued by DOL after the filing of the complaint equated Villegas' finding the severed pig head with the scene in Francis Ford Coppola's film *The Godfather* in which the character of Don Corleone has his consigliere place a horse head in the bed of a Hollywood producer after making him "an offer he can't refuse." No one from the DOL discussed the events described in the lawsuit with Defendants prior to the filing of the lawsuit.

The complaint identifies the protected activity as the February 28, 2022 complaint filed by Cazares and complaints made by Cazares and Villegas about how they were paid in the weeks

10

after the February complaint. (Cmplt. p. 1, ECF No. 1.) The complaint also identifies the following acts of retaliation allegedly taken by Defendants against Cazares and Villegas: (1) threatening to terminate their employment; (2) ordering both employees to sign a document stating they would stop communicating about overtime pay with other employees; (3) threatening both employees by placing, or causing the placement of, a severed pig head in the workspace of Villegas; (4) accusing Cazares and Villegas of creating tension among, or riling up, certain other employees of Defendants related to the overtime issue; and (5) berating and belittling Villegas due to his protected activity and association with Cazares. (*Id.* at p. 2.)

Turning now to the Rule 65 factors required for the issuance of an injunction, the Court must first determine if Plaintiff has shown a likelihood of success on the merits. A plaintiff must show four elements to establish a prima facie case of retaliation under § 215: (1) he or she engaged in a protected activity under the FLSA; (2) his or her exercise of this right was known by the employer; (3) thereafter, the employer took an employment action adverse to him or her; and (4) there was a causal connection between the protected activity and the adverse employment action. *Caudle v. Hard Drive Express, Inc.*, 91 F.4th 1233, 1237-38 (6th Cir. 2024). "Under the *McDonnell Douglas* framework, which applies to FLSA retaliation claims, if the plaintiff establishes a prima facie case, 'the burden then shifts to the defendant to set forth a legitimate, non-discriminatory reason for the adverse employment action.' The plaintiff must then prove the defendant's proffered reasons were pretextual." *Id.* at 1238.

Defendants claim that Plaintiff has not shown a prima facie case of retaliation or that their stated reasons for their actions were false and a pretext for retaliation. As for the first factor, whether plaintiff (or in this case the complainants, Cazares and Villegas) engaged in activity protected under the FLSA and known by the employer, the Court finds that Plaintiff introduced

11

enough evidence at the hearings to show that Cazares and Villegas, in particular Cazares, reported FLSA violations to the DOL which resulted in an investigation and subsequent fines and penalties assessed against Tosh. Both Cazares and Villegas received backpay as a result of the findings made against Tosh. Rosa and Tosh's attorney both knew that Cazares and Villegas were on the list to receive backpay.

Moreover, Cazares emailed Rosa at least twice with questions about her pay. While Rosa testified that she considered the emails to be payroll issues and not wage and hour complaints, she did, in fact, know that Cazares had questions about her pay. Additionally, Rosa knew that Cazares and Villegas were discussing pay and overtime concerns with their co-workers. Accordingly, the Court finds at this juncture that Plaintiff has presented enough evidence to show that Cazares and Villegas engaged in protected activity under the FLSA and that the exercise of this right was known by Tosh's agents.

However, Plaintiff has failed to show that Tosh took an adverse action against Cazares and Villegas. In its brief, Plaintiff identifies the adverse actions as the disciplinary notices issued at their meetings with Rosa, the termination threat "both verbally and via the notices," and the placing of the pig head in the tractor bucket. Plaintiff appears to concede that a write-up alone is not sufficient to constitute an adverse action. (Pl's Trial Br. p. 10, n. 7, ECF No. 25.) But Plaintiff argues that the write-ups (or disciplinary notices) in this case contained the "threat" that future disciplinary action, up to and including termination would result if "the incident occurs again." (*Id.*)

An "adverse employment action" in the context of a retaliation claim is conduct "which has a materially adverse effect on the plaintiff, irrespective of whether it is employment or workplace related." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67–68 (2006)). Conduct

12

is "materially adverse" in the retaliation context if it "might have dissuaded a reasonable worker from making or supporting" an FLSA claim. *Id.* at 68 (internal quotations omitted). The anti-retaliation provision "protects an individual not from all retaliation, but from retaliation that produces an injury or harm," such that "petty slights, minor annoyances, and simple lack of good manners" are generally not sufficient. *Id.* A write-up alone, without an accompanying reduction in pay, benefits, or some other adverse effect, is not sufficient to constitute an adverse employment action. *See e.g.*, *Manley v. DeKalb Cnty., Ga.*, 587 F. App'x 507, 513 (11th Cir. 2014); *Johnson v. Advertiser Co.*, 778 F.Supp.2d 1270, 1279 (M.D. Ala. 2011). *See also Kubiak v. S.W. Cowboy, Inc.*, 164 F. Supp. 3d 1344, 1367 (M.D. Fla. 2016) (citations omitted) ("A write-up alone, without any indication that it was accompanied by a reduction in pay, benefits, responsibilities, or some other adverse effect, is insufficient to establish an adverse employment action.") Such an action, without more, would be insufficient to "dissuade[ ] a reasonable worker from making or supporting a charge" against an employer. *Burlington*, 548 U.S. at 68.

Although Plaintiff argues that the write-up "threatened" termination, the Court views the language on the discipline notice that future infractions could result in additional discipline "up to and including termination," as standard fare for companies that engage in progressive discipline. *C. f. Reeser v. Henry Ford Health Sys.*, 119 F. Supp. 3d 710, 720 (E.D. Mich. 2015) (discussing the employee's attempts to show FLSA retaliation because "she was not treated in accordance with [the company's] progressive discipline policy which should have required the imposition of less serious sanctions prior to dismissal.") In this case, both Cazares and Villegas received the least amount of discipline under Tosh's progressive discipline policy, i.e., a "documented verbal warning." There is no dispute that Cazares and Villegas have not been terminated from their positions nor have they received a reduction in pay.

Cazares and Villegas' testimony at the hearings that they were "threatened with termination" conflicts with the written disciplinary reports and the testimony of Rosa and Dr. Krantz that they were merely told that further infractions could result in discipline <u>including</u> termination, and the Court finds that Plaintiff has not met its burden on this issue. Additionally, Rosa's words of caution had to be translated from English to Spanish by Gomez, and some of the meaning may have been lost during the translation.

Although no evidence was admitted that Rosa or any other agent of Tosh placed the pig head in the tractor bucket, Plaintiff asks the Court to draw an inference that they are responsible for this action. This the Court cannot do. Not only is there no evidence of such an action by any agent of Tosh, Robert Toledo testified that he placed the pig head in the tractor bucket for it to be composted with other pig remains after cooking the remainder of the pig that weekend. He affirmatively stated that no one told him to put it in the tractor and that he did not intend to offend anyone by putting it there. The Court declines Plaintiff's invitation to speculate that the pig head found by Villegas was not the one placed in the bucket by Toledo. In the absence of any evidence that an agent of Tosh placed the pig head where Villegas could discover it, the Court cannot find that the presence of the pig head was meant to intimidate Villegas. *See Hadix v. Caruso*, 2007 WL 2701972, at *5 (W.D. Mich. Sept. 10, 2007), *aff'd in part*, 297 F. App'x 504 (6th Cir. 2008) ("It remains [a preliminary injunction plaintiff's] burden throughout the proceeding to prove the factual basis for relief.") Thus, the Court cannot find that the presence of the pig head in the tractor bucket was an adverse action.

Returning to the disciplinary notices, even if Plaintiff had established that their issuance constituted an adverse action, Defendants have presented evidence that has not been shown to be pretextual that Cazares and Villegas were given the notices because of the complaints of three

14

other employees that Cazares and Villegas were badgering and harassing them to engage in a walk-out on January 14. The written complaints of the other employees were introduced into evidence at the hearings. (Hearing Exhibit 12.)  Rosa's testimony that the other employees had made complaints about Cazares and Villegas went unchallenged. Cazares and Villegas merely claimed that they did not initiate the group chat.

Accordingly, because Plaintiff has failed to show that an adverse action was taken against Cazares and Villegas or that the stated legitimate, non-retaliatory reason for the disciplinary notices was pretextual, it has not established a likelihood of success on the merits. And, because no adverse action has been shown, Plaintiff cannot show a "causal connection" between an adverse action and retaliation.

Next, the Court must consider whether Plaintiff will suffer irreparable harm if the injunction is not granted.  In support of its argument that it will suffer such harm, Plaintiff points to its claims of adverse actions taken against Cazares and Villegas. Because the Court has found that these claims were not substantiated at the hearing, Plaintiff may not rely on them to support this factor.  "At the preliminary injunction stage, a district court is not required to resolve 'doubtful questions of law or disputed questions of fact." *Neveux v. Webcraft Techs., Inc.*, 921 F. Supp. 1568, 1571 (E.D. Mich. 1996) (citations omitted).

Moreover, the evidence at the hearings showed that Tosh and its agents cooperated with Investigator Williams during the February 2022 investigation, remediated problems with the housing, and paid all back wages and fines that were due. There was no testimony that either Cazares and Villegas or any other Tosh employee has been prevented from talking to Investigator Williams or anyone else associated with DOL or that Tosh has been uncooperative during a second investigation.

Plaintiff's argument as to this factor rests entirely on its assumption that retaliation has already occurred. "[T]he public also would be irreparably harmed if Defendants' retaliation **remains unchecked**." (Trial Br. p. 13, ECF No. 25 (emphasis added).) As discussed above, Plaintiff has failed to meet its burden to show that retaliation has, in fact, occurred.

Additionally, as noted by Defendant, if retaliation does occur later, Cazares and Villegas may be awarded damages. A plaintiff's asserted harm is not irreparable if it is "fully compensable by monetary damages." *Overstreet*, 305 F.3d at 578; *see also Regents of Univ. of California v. Am. Broad. Companies, Inc.*, 747 F.2d 511, 519 (9th Cir. 1984) (reiterating "the principle that the exercise of equitable jurisdiction is predicated on the absence of an adequate remedy at law."). Termination of Cazares or Villegas or reduction in benefits, pay, or duties, if proven to be retaliatory, would be compensable by monetary damages under 29 U.S.C. § 216(b).

As for serving the public interest, Plaintiff correctly states that a preliminary injunction to stop retaliation does serve the public interest, especially in light of the Wage and Hour Division's efforts to enforce DOL regulations. On the other hand, issuing a preliminary injunction when there is conflicting evidence as to whether retaliation actually occurred does not serve the public interest and, instead, could create reputational and possible economic harm to a defendant who has been subjected to press releases likening its unproved actions to those of Don Corleone in *The Godfather*. The testimony that Cazares or Villegas are both still employed and their pay and benefits have never been reduced was undisputed. Moreover, no evidence was submitted that Defendants have prevented or dissuaded any employee, including Cazares and Villegas, from filing any complaint with Plaintiff regarding Tosh's pay practices.

"[A]preliminary injunction is "an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Hadix*, 2007

WL 2701972, at *5 (quoting 11A Charles Alan Wright *et al.*, *Federal Practice and Procedure* § 2948, at 129-130 (2d ed.1995)). In this case, Plaintiff has not carried its burden on the factors necessary for the issuance of a preliminary injunction. Consequently, Plaintiff's motion for a preliminary injunction is **DENIED**.

    **IT IS SO ORDERED**.

    **s/ S. Thomas Anderson**
S. THOMAS ANDERSON
UNITED STATES DISTRICT JUDGE

Date:  May 16, 2024.