## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
## EASTERN DIVISION

| | |
|---|---|
| **LORIE CHAVEZ-DEREMER,** | ) |
| **Secretary of Labor,** | ) |
| **United States Department of Labor,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) **Case No. 1:24-cv-01038-STA-jay** |
| | ) |
| **TOSH PORK, LLC and** | ) |
| **DIANNA ROSA,** | ) |
| | ) |
| **Defendants.** | ) |

## <u>ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT</u>

Plaintiff Julie A. Su, Acting Secretary of Labor, United States Department of Labor ("DOL") filed this action against Defendants Tosh Pork, LLC and Dianna Rosa seeking to enjoin them and their agents, servants, employees, and all persons in active concert or participation with them from violating the provisions of § 15(a)(3) of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 215(a)(3), by retaliating against current and/or former employees who engage in protected activity.[1]   Defendants have filed a motion for summary judgment (ECF Nos. 112-115), and Plaintiff has filed a response to the motion. (ECF Nos. 119-121.) Defendants have filed a reply to the response. (ECF Nos. 125-126.)

Subsequent to the briefing on the motion for summary judgment, the Magistrate Judge partially granted and partially denied Plaintiff's motion to compel an extension of discovery so that she could inquire into the terminations and progressive discipline of Ma Concepcion Cazares

---

[1] Lori Chavez-Deremer is the current Secretary of Labor for the United States Department of Labor. The Clerk of the Court is **DIRECTED** to substitute Chavez-Deremer for Julie Su as the plaintiff.

and Carlos Villegas. (ECF No. 128.) The Magistrate Judge granted the motion as to the narrow question of whether disciplinary notices issued in January 2024 were considered in the decision to terminate Cazares and Villegas in October 2024. The Magistrate Judge ordered Defendants to reproduce Diana Rosa and Dr. Seth Krantz for a continuation of their depositions for that limited purpose. In light of the Magistrate Judge's order, the trial of this matter was continued, and the parties were allowed fourteen days in which to file a supplement to their summary judgment briefs after the completion of the continued depositions of Rosa and Dr. Krantz. (ECF No. 129.)

On May 14, 2025, Plaintiff filed a notice that the continued depositions were taken on April 30, 2025, but she did not intend to supplement the summary judgment briefing "[a]t this point." (No. 131.) On that same date, Defendants timely filed excerpts of the renewed depositions of Rosa and Dr. Krantz, a supplemental statement of facts not in dispute, and a supplemental memorandum in support of their motion for summary judgment as previously allowed by the Court. (ECF Nos. 132-134.) On May 28, 2025, Plaintiff filed an untimely response to Defendants' supplemental statement of facts without seeking an extension of time in which to do so. (ECF No. 135.) However, in light of the fact that Defendants did not move for the untimely response to be stricken, the Court will allow it.

For the reasons set forth below, Defendants' motion is **GRANTED**.

<u>Standard of Review</u>

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). When deciding a motion for summary judgment, the Court must review all the evidence in the light most favorable to the non-moving party and must draw all reasonable

inferences in favor of the non-movant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The Court "may not make credibility determinations or weigh the evidence." *Laster v. City of Kalamazoo*, 746 F.3d 714, 726 (6th Cir. 2014).

When the motion is supported by documentary proof such as depositions and affidavits, the non-moving party may not rest on his pleadings but, rather, must present some "specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Eastham v. Chesapeake Appalachia, L.L.C.*, 754 F.3d 356, 360 (6th Cir. 2014). These facts must be more than a scintilla of evidence and must meet the standard of whether a reasonable juror could find by a preponderance of the evidence that the non-moving party is entitled to a verdict. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). The Court should ask "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52. The Court must enter summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

<u>Statement of Undisputed Material Facts</u>

Pursuant to the Local Rules of this Court, Defendants have prepared a statement of material undisputed facts (ECF No. 115) "to assist the Court in ascertaining whether there are any material facts in dispute." Local Rule 56.1(a). Plaintiff has responded to Defendants' statement and has attached her own statement of facts. (ECF No. 120.) Defendants have responded to Plaintiff's statement of facts. (ECF No. 125.) And, as noted above, Defendants supplemented their statement of facts (ECF No. 133) to which Plaintiff has responded. (ECF No. 135.)

A fact is material if it "might affect the outcome of the lawsuit under the governing

substantive law." *Baynes v. Cleland*, 799 F.3d 600, 607 (6th Cir. 2015) (citing *Wiley v. United States,* 20 F.3d 222, 224 (6th Cir. 1994), and *Anderson,* 477 U.S. at 247–48). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson,* 477 U.S. at 248. For purposes of summary judgment, a party asserting that a material fact is not genuinely in dispute must cite to particular parts of the materials in the record and show that the materials fail to establish a genuine dispute or that the adverse party has failed to produce admissible evidence to support a fact. Fed. R. Civ. P. 56(c)(1). Here, as the non-moving party, Plaintiff must respond to Defendants' statement of fact "by either (1) agreeing that the fact is undisputed; (2) agreeing that the fact is undisputed for the purpose of ruling on the motion for summary judgment only; or (3) demonstrating that the fact is disputed." Local Rule 56.1(b). Additionally, Plaintiff may "object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2).

If Plaintiff asserts that a genuine dispute of material fact exists, she must support her contention with a "specific citation to the record." Local Rule 56.1(b). If a party fails to demonstrate that a fact is disputed or fails to address the opposing party's statement of facts properly, the Court will "consider the fact undisputed for purposes" of ruling on the motion. Fed. R. Civ. P. 56(e)(2); *see also* Local Rule 56.1(d) ("Failure to respond to a moving party's statement of material facts, or a non-moving party's statement of additional facts, within the time periods provided by these rules shall indicate that the asserted facts are not disputed for purposes of summary judgment."). Under Rule 56 of the Federal Rules of Civil Procedure, the Court "need consider only the cited materials" but has discretion to "consider other materials in the record." Fed. R. Civ. P. 56(c)(3). In the present case, both parties object to certain portions of the opposing party's statement of facts. The Court finds that there is no genuine dispute as to the following

material facts, unless otherwise noted.[2]

Tosh Pork, a family owned and family run business, is a Tennessee limited liability company engaged in the agriculture industry. This includes operating pig farms located in Tennessee. Dianna Rosa is the human resources manager for Tosh Pork. Ma Concepcion "Katy" Cazares and her husband Carlos Villegas were employees of Tosh Pork at the time of the relevant events. Both were H-2A visa workers under the Immigration and Nationality Act, 8 U.S.C. §§ 1101(a)(15)(H)(ii)(a), 1184 (c), and 1188.

The H-2A visa program allows U.S. based employers, who meet certain requirements, to hire workers from other countries to perform agricultural work of a temporary or seasonal nature. *See* 20 C.F.R. Part 655 and 29 C.F.R. Part 501. The "TN visa" is a work visa intended for individuals with professional certifications from Canada and Mexico. *See* 8 C.F.R. § 214.6. This visa allows citizens of Mexico or Canada to work in the United States for a period of three years, subject to extension and renewal. Cazares and Villegas are Mexican nationals who worked for Tosh Park pursuant to the TN visa program; as such, they were protected by H-2A regulations because they worked in corresponding employment.

Cazares and Villegas were sow herdsman, and each had the same duties.  During their employment with Tosh Pork, Cazares and Villegas' rate of pay never decreased and their job duties never changed other than at times Cazares was required to clean bathrooms and offices.

Cazares made a complaint on February 28, 2022, against Tosh Farms[3] regarding the requirements applicable to the employment of H-2A visa workers, including whether workers were

---

[2]  The parties have not disputed some facts and state that other facts are disputed only for the purpose of the Court's deciding the motion for summary judgment. All facts are stated for the purpose of deciding this motion only.
[3]  It is not clear whether Tosh Farms and Tosh Pork are separate and distinct legal entities as maintained by Defendants. Plaintiff argues that the two entities have common ownership and their

required to pay for their housing and travel. They also complained about the poor conditions of their housing.  The complaint involved "various allegations of shortness of pay, shortness of hours worked, and retaliation," and was partially based on Cazares' "work[ing] too many hours without overtime."

As a result of that complaint, over the course of sixteen to eighteen months, DOL's Wage and Hour Division conducted an investigation, ultimately determining that Tosh Farms had violated the regulations governing the H-2A visa program in several ways. Gary Williams was DOL's investigator.

In addition to filing a formal complaint with the Wage and Hour Division, Cazares complained multiple times in 2021 and 2022 to Tosh Pork management, including Rosa, about issues with her pay.

In September 2023, the Wage and Hour Division provided Rosa with a document summarizing the back wages that they had calculated for the affected employees. Cazares and Villegas were two of the five employees on the list. In total, the Wage and Hour Division found that Tosh Farms underpaid five workers by approximately $39,000. The Wage and Hour Division also assessed civil money penalties totaling $36,741 for these violations. Additionally, Tosh made repairs to the housing as required by DOL.

While Cazares reported a fear of retaliation during the investigation, Williams did not substantiate retaliation.

---

business is conducted for the same purpose. The September 2022 complaint was filed against Tosh Farms, whereas the present action is against Tosh Pork. The relationship between the entities is not material to the issues presented in the motion for summary judgment.

Cazares continued to complain to Defendants about her pay and/or work hours after the Wage and Hour Division investigation. In October 2023, Cazares sent an email to Rosa inquiring about overtime pay. In that email, Cazares questioned why she was not being paid overtime, the number of hours she was working, and why a certain paystub indicated that she worked eighty hours when ninety hours had actually been worked in that pay period.

In December 2023, she again emailed Rosa asking her to explain how her pay was being calculated. Cazares, again, complained about being underpaid for the number of hours she worked.

During this same time period, Cazares and Villegas participated in a WhatsApp group chat with other employees, wherein issues at work were discussed, including issues regarding pay. The WhatsApp group chat was created by Roberto Toledo Estrada, an employee of Tosh Pork, who invited Cazares and other employees, including Villegas, into the chat; no managers were invited to join the chat. The WhatsApp group chat did not last more than two months.

Sometime after September 2023, Villegas started to notice that the behavior of his supervisor, Marcelo Gomez, had changed. Villegas nevertheless thought everything was okay until December 2023 when the pressure intensified; Gomez was "bringing into question [Villegas'] professional work;" and Villegas felt pressured and intimidated. Villegas also testified that Gomez used "intimidating gestures" toward him while he was working on the pig farm. After the settlement that resulted from the 2022 complaint, Villegas thought that Gomez became more critical, used a loud voice when communicating with him, and stared at him.

Villegas complained to Gomez in early January 2024 about his wages. Gomez said that he could not do anything about his wages.

Other Tosh employees were not aware of Cazares or Villegas being treated differently than other employees and had never seen anyone mistreat Cazares or Villegas.

On January 18, 2024, Rosa was informed by Jose Santiago, the Regional Sow Farm Manager, that three employees had made verbal complaints regarding Cazares and Villegas' behavior that was causing stress to those three employees. Rosa told Santiago that the employees would need to file written statements if they wanted to make a formal complaint in order to have that behavior addressed. Thereafter, Rosa received written statements from each of the three employees complaining about Cazares and Villegas' behavior. The employees complained, in part, that Cazares and Villegas had asked the employees not to show up for work on January 14, 2024. One of those three employees, Nancy Gonzales, worked with and around Cazares and made her written complaint because she was "tired and angry of all of [Cazares and Villegas'] whining" and Cazares not "want[ing] to work." Gonzales made a complaint so that Tosh management could address these issues and "improve the way [Cazares and Villegas] worked." Gonzales had never before made a written complaint about another employee in her six years working at Tosh.

After discussing the matter with Santiago, Rosa determined that the appropriate action would be a documented verbal warning to let Cazares and Villegas know that harassment at work was unacceptable and to tell them to stop harassing their co-workers. Accordingly, Rosa scheduled separate meetings with Cazares and Villegas for January 23, 2024. Two additional Tosh employees, Dr. Seth Krantz, a veterinarian, and Marcelo Gomez, attended the meeting with Cazares. Gomez was Villegas' manager and served as an interpreter - English to Spanish and vice versa.

During the meetings, Cazares and Villegas were given warnings regarding their behavior toward the other employees. The two disciplinary notices, i.e., "Team Member Discipline Notice," were on pre-printed forms and contained boxes to be checked for progressive discipline: documented verbal warning, written warning, final written warning, termination, and other. The notices given to Cazares and Villegas had the box "documented verbal warning" checked.

The notices stated that each employee was "creating a disturbance in the workplace" by "badgering" other employees in order to demand better pay/time off and to not show up for work on January 14, 2024. The disciplinary notice issued to Cazares stated that "further disciplinary action up to and including termination" will be imposed should the incident occur again.[4] According to Rosa, this was standard language included on disciplinary notices. Cazares testified at the preliminary injunction hearing that she did not read the document presented to her by Rosa and refused to sign it.

During his own meeting, Villegas wanted to discuss other topics including his desire for advancement at Tosh. Rosa explained that attitude and ability to get along with others would drive and impact his future opportunities. Villegas had previously obtained a loan from Tosh that had to be repaid with interest. Rosa told him that, if he resigned from his job, he would not be expected to pay back the loan.

Rosa's handwritten notes from the meeting were made immediately after the meeting and state that Cazares was told that she must keep a good attitude while at work and not bring the team down. If she continued with negativity, it would result in further discipline, including termination. Cazares responded that she would be professional.

Rosa, Dr. Krantz, and a translator later participated in a call with Cazares and clarified that her write-up was not associated with the group chat; instead, it concerned her harassment of her co-workers that was causing stress in her co-workers and affecting productivity.

---

[4] Villegas' disciplinary notice actually said "intimidation" rather than "termination" as written on Cazares' disciplinary notice. Rosa testified that this was an error.

Between the time of the meeting and the filing of the initial complaint in this matter neither Cazares nor Villegas were terminated or had their pay or benefits reduced. In April 2024, Cazares was working fewer hours without any decrease in pay and was happy about it.

Investigator Williams acknowledged that it was not improper for an employer to instruct an employee not to badger or harass other employees.

After Villegas left the meeting, Gomez directed Villegas to use a tractor to take dead pigs to the compost pile.[5] This was part of his regular job duties. When Villegas got to the tractor, he noticed a decapitated pig head sticking out of a white plastic bag in the bucket of the tractor. He did not know how the pig head got there but believed that this was an act meant to intimidate him and that it related to his meeting with Rosa. Villegas documented the incident with his cell phone and reported the incident to a supervisor and Rosa; he spoke with another manager the next day about finding the pig head and described the situation as "a hostile work environment." He felt unsafe after finding the pig head and believed it was an act of intimidation related to Defendants' desire to terminate his employment.  Thereafter, Defendants looked into who had placed the pig head in the tractor bucket.

It is customary to place pig remains or portions of pig remains in the front blade of the tractor for composting - although it is not customary to leave portions of pigs, including pig heads, in the tractor bucket. Composting occurs every day at Tosh.

---

[5] Plaintiff asserts that Villegas was directed by Manager Gomez to use a "particular" tractor. However, her citations to the record do not support that assertion. Instead, the cited testimony states Villegas was told to "deal with the dead pigs," which he "frequently" did. (Tr. 46:11-18, ECF No. 26.)

As of the April 3, 2024 preliminary injunction hearing, Villegas had not been given an explanation for the presence of the pig head, with Cazares only being told it was "compost" with no further explanation. Villegas does not know who placed the pig head in the tractor bucket.

At the hearing, Roberto Toledo Estrada, an employee of Tosh Pork (but not a manager or supervisor), testified that he placed a pig head in the bucket of the tractor on Monday, January 22, 2024, when he got to work around 6:00 a.m. He said that he was given a pig by the company the previous week as an employee benefit; he took the pig home, slaughtered it, and had a cookout at his house on Saturday, January 20, 2024. He then brought the pig head back to work on Monday to dispose of it because he did not know how to cook the head. He placed the head in the bucket of the tractor so that it could be taken to compost.[6] The pig head was not in a white plastic bag when he put it in the bucket of the tractor on Monday morning, although Villegas testified that, when he found the pig head on Tuesday afternoon, the pig head was in a plastic bag. No one told Toledo Estrada to put the head in the tractor bucket, and he did not intend to offend anyone.

According to Villegas, he had gone to the compost area, where he retrieved the tractor that the pig head was found in, on Monday, but he did not see the pig head until Tuesday, January 23, 2024.

Cazares, Villegas, and Investigator Williams all testified that they did not believe that Rosa had put the pig head in the tractor bucket and did not know who had done so. Cazares stated that she had no independent knowledge of anything to do with the severed pig head.

---

[6] Although Plaintiff disputes Toledo Estrada's testimony, she has not pointed to anything in the record to contradict it other than pointing to Villegas' testimony that he did not remember seeing the pig head in the tractor bucket on Monday and the differing accounts as to whether the pig head was in a white plastic sack.

As of the date of the preliminary injunction hearing, Cazares and Villegas had not been terminated by Tosh and, even though their hours were reduced, their pay had not been reduced. Cazares testified that Tosh had never stopped her from contacting DOL or from taking a day off to assist with DOL's investigation.

DOL opened a second investigation against Tosh in February 2024 for alleged retaliation against Cazares and Villegas. This investigation was on-going at the time of the hearing. At the time of the hearing, there was no ongoing investigation as to the alleged failure to pay overtime to Cazares and Villegas. Neither party has provided an update to the Court as to that investigation.

In February 2024, Investigator Williams investigated the pig head incident on behalf of the DOL. During his investigation into the incident, Investigator Williams spoke with Cazares and Villegas. Neither one told Investigator Williams who placed the pig head in the tractor bucket. Neither Villegas nor Cazares told Investigator Williams that Rosa placed the pig head in the tractor bucket. Investigator Williams testified that "there was no indication that Dianna Rosa" placed a pig head in the tractor bucket.

Cazares and Villegas were terminated in October 2024. Both Rosa and Dr. Krantz testified at their continued depositions that they had no personal knowledge as to why Cazares and Villegas were terminated, and neither was involved in the decision-making.

Defendants have a progressive disciplinary policy wherein infractions stay on an employee's record for at least twelve months.

<u>Analysis</u>

The FLSA provides for equitable relief in a suit brought under its anti-retaliation provisions, 29 U.S.C. §§ 215(a)(3); 216(b).[7] Section 215(a)(3) specifically prohibits retaliatory

---

[7] Section 215(a)(3) makes it unlawful:

action against employees who file complaints, pursue actions, or participate in proceedings under the FLSA. *See Walsh v. Z4 Fuels, LLC*, 2022 WL 18587116, at *1 (E.D. Ky. Apr. 8, 2022). Section 217 gives district courts "jurisdiction, for cause shown, to restrain violations of section 215**.**" *Id.*

> "An injunction reinstating employees to their former position and restraining further retaliation fits squarely within the relief available under § 216(b), which allows an employee to obtain, 'without limitation,' equitable relief that is 'appropriate to effectuate the purposes' of the antiretaliation provision." [*Bailey v. Gulf Coast Transp. Inc.*, 280 F.3d 1333, 1335–1336 (11th Cir. 2002)]. A preliminary injunction may be entered because the "antiretaliation provision was meant 'to foster a climate in which compliance with the substantive provisions of the Act would be enhanced' by protecting employees who come forward with complaints." *Id.* at 1337. Thus, when employees have demonstrated a likelihood of success on the merits and satisfied the other requirements for preliminary injunctive relief, "allowing for such relief to put the employee back in the position he held before the employer's retaliatory conduct is consistent with § 216(b) — it is a form of equitable relief that effectuates the purposes of the antiretaliation provision." *Id.*

*Bowman v. New Vision Telecommunications, Inc.*, 2009 WL 5031315, at *13 (M.D. Tenn. Dec. 14, 2009).

The amended complaint in this matter identifies the protected activity as the February 28, 2022 complaint filed by Cazares and complaints made by Cazares and Villegas about how they were paid in the weeks after the February complaint. (Cmplt. pp. 1-2, ECF No. 88.) The amended complaint identifies the following acts of retaliation allegedly taken by Defendants against Cazares and Villegas: (1) Defendants' pressuring them to resign and/or threatening to terminate their

---

> to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter, or has testified or is about to testify in any such proceeding, or has served or is about to serve on an industry committee.

Section 216(b) provides, in part,

> Any employer who violates the provisions of section 215(a)(3) or 218d of this title shall be liable for such legal or equitable relief as may be appropriate to effectuate the purposes of section 215(a)(3) or 218d of this title, including without limitation employment, reinstatement, promotion, and the payment of wages lost and an additional equal amount as liquidated damages.

employment; (2) being issued disciplinary notices at the January 23, 2024 meeting; (3) Defendants' ordering both employees to stop communicating about overtime pay with other employees; (4) Defendants' threatening both employees by placing, or causing the placement of, a severed pig head in the bucket of the tractor that Villegas used; (5) Defendants' accusing Cazares and Villegas of creating tension among, or riling up, certain other employees of Tosh related to the overtime issue; and (6) Manager Gomez's berating and belittling Villegas due to his activity and association with Cazares. (*Id.* at pp. 5-7.) The amended complaint, which was filed on October 23, 2024, does not allege that the termination of Cazares and Villegas' employment that same month was an act of retaliation.

Absent direct evidence of discrimination, FLSA retaliation claims are subject to the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See, e.g.*, *Spiteri v. AT & T Holdings, Inc.*, 40 F. Supp. 3d 869, 874–75 (E.D. Mich. 2014) (citing *Adair v. Charter County of Wayne*, 452 F.3d 482, 489 (6th Cir. 2006)). In the present case, Plaintiff has pointed to no direct evidence of retaliation. Therefore, the Court will look to the burden-shifting framework. A plaintiff must show four elements to establish a prima facie case of retaliation under § 215: (1) he or she engaged in a protected activity under the FLSA; (2) his or her exercise of this right was known by the employer; (3) thereafter, the employer took an employment action adverse to him or her; and (4) there was a causal connection between the protected activity and the adverse employment action. *Caudle v. Hard Drive Express, Inc.*, 91 F.4th 1233, 1237-38 (6th Cir. 2024). "Under the *McDonnell Douglas* framework, …if the plaintiff establishes a prima facie case, 'the burden then shifts to the defendant to set forth a legitimate, non-discriminatory reason for the adverse employment action.' The plaintiff must then prove the defendant's proffered reasons were pretextual." *Id.* at 1238.

As for the first factor, whether the plaintiff (or in this case the complainants, Cazares and Villegas) engaged in activity protected under the FLSA and known by the employer, it is undisputed that Cazares and Villegas, in particular Cazares, reported FLSA violations to the DOL which resulted in an investigation and subsequent fines and penalties assessed against Tosh. Both Cazares and Villegas received backpay as a result of the findings made against Tosh. Rosa and Tosh's attorney both knew that Cazares and Villegas were on the list to receive backpay. Thus, the Court finds, as a matter of law, that it is undisputed that Cazares and Vilegas engaged in protected activity under the FLSA which was known to Defendants.

The parties disagree as to whether Plaintiff has shown that Tosh took adverse actions against Cazares and Villegas. As previously discussed, Plaintiff identifies the adverse actions as Defendants' warning Cazares and Villegas to stop communicating about overtime pay with other employees and accusing them of creating tension among their co-worker; Villegas' manager "berating and belittling" him; Defendants' issuing disciplinary notices at their meetings with Rosa and being threatened with termination; and the placing of the pig head in the tractor bucket – again, no mention is made of their termination.

At the outset, the Court finds that Plaintiff has failed to refute Defendants' evidence that neither Rosa nor any Tosh manager or supervisor had anything to do with the placement of the pig head in the tractor bucket. Roberto Toledo Estrada testified that he placed a pig head in the bucket of the tractor on Monday, January 22, 2024, to dispose of the head for his own personal reasons. This testimony was unrefuted, and Cazares and Villegas have acknowledged that they do not know who placed the head in the bucket.

Although no evidence was admitted that Rosa or any other agent of Tosh placed the pig head in the tractor bucket, Plaintiff asks the Court to draw an inference that Defendants are

responsible for this action. This the Court cannot do without some evidence of Defendants' culpability. The Court declines Plaintiff's invitation to speculate that the pig head found by Villegas was not the one placed in the bucket by Toledo Estrada. In the absence of any evidence that an agent of Tosh placed the pig head where Villegas could discover it, the Court cannot find that the presence of the pig head was meant to intimidate Villegas. *See Hadix v. Caruso*, 2007 WL 2701972, at *5 (W.D. Mich. Sept. 10, 2007), *aff'd in part*, 297 F. App'x 504 (6th Cir. 2008) ("It remains [an injunction plaintiff's] burden throughout the proceeding to prove the factual basis for relief.") Accordingly, the Court finds that the events surrounding the pig head in the bucket do not constitute an adverse action.

As for Plaintiff's claims concerning the treatment of Villegas by his supervisor, Marcelo Gomez, Defendants have not disputed that, beginning in September 2023, Villegas thought that Gomez was "pressuring him while at work." Gomez would occasionally stare at him and "bring[] into question" Villegas' work. However, it is well-settled that a "bruised ego" does not constitute an adverse action. *See Kocsis v. Multi–Care Mgmt., Inc.*, 97 F.3d 876, 886 (6th Cir. 1996); *Diakite v. Yellen*, 2024 WL 665534, at *3 (E.D. Mich. Feb. 16, 2024) (quoting "bruised ego" language of *Kocsis*); *Grose v. Am. Airlines, Inc.*, 2021 WL 1876152, at *8 (W.D. Tenn. Mar. 5, 2021) (same); *Briars v. Memphis Light Gas & Water*, 2018 WL 3061345, at *2 (W.D. Tenn. Jan. 25, 2018) (same). *See also Mitchell v. Vanderbilt Univ.*, 389 F.3d 177, 182 (6th Cir. 2004) ("The Sixth Circuit has consistently held that de minimis employment actions are not materially adverse and, thus, not actionable." (citation omitted)). In the present case, there is no evidence that Villegas' work hours, pay, and job responsibilities were affected by any actions of Gomez in pressuring him or questioning his work. Therefore, the Court finds that the actions of Gomez toward Villegas did not constitute an adverse action. *See also Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S.

53, 67–68 (2006) ("The antiretaliation provision 'protects an individual not from all retaliation, but from retaliation that produces an injury or harm,' such that 'petty slights, minor annoyances, and simple lack of good manners' are generally not sufficient.")

Plaintiff next claims as an adverse action the write-ups (or disciplinary notices) which contained the "threat" that future disciplinary action, up to and including termination, would result if Cazares and Villegas continued to "harass" their co-workers.  Plaintiff points to the fact that Cazares and Villegas were, in fact, terminated in October 2024.

Prior to the Supreme Court's decision in *Muldrow v. City of St. Louis*, 601 U.S. 346 (2024), an "adverse employment action" in the context of a Title VII discrimination claim was defined as conduct "which has a materially adverse effect on the plaintiff, irrespective of whether it is employment or work-place related." *Burlington*, 548 U.S. at 67–68. Conduct was "materially adverse" in the retaliation context if it "might have dissuaded a reasonable worker from making or supporting" an FLSA claim. *Id.* at 68 (internal quotations omitted). Pre-*Muldrow*, a write-up alone, without an accompanying reduction in pay, benefits, or some other adverse effect, was not sufficient to constitute an adverse employment action. *See e.g.*, *Manley v. DeKalb Cnty., Ga.*, 587 F. App'x 507, 513 (11th Cir. 2014); *Johnson v. Advertiser Co.*, 778 F. Supp. 2d 1270, 1279 (M.D. Ala. 2011).

In *Muldrow*, the Supreme Court eliminated the heightened standard for actions considered to be "adverse" in Title VII discrimination claims. The Court explained that "[t]he words 'discriminate against' ... refer to 'differences in treatment that injure' employees."  601 U.S. at 347 (quoting *Bostock v. Clayton Cty.*, 590 U.S. 644, 681 (2020)). The Court noted that Title VII's "discriminate against" language means "treat worse," but it clarified that "neither that phrase nor any other says anything about how much worse." *Id.* Thus, under *Muldrow*, "[t]o make out a Title

VII discrimination claim, a[n] [employee] must show *some* harm respecting an identifiable term or condition of employment." *Id.* (emphasis added). However, *Muldrow* reiterated the standard that an adverse action for purposes of a retaliation claim (as opposed to a discrimination claim) remains one that would "dissuade a reasonable worker from making or supporting a charge of discrimination." *Id.* at 348.

> Notably, the U.S. Supreme Court's holding in *Muldrow* lowering the bar for what constitutes an "adverse employment action" in the disparate treatment and hostile-work-environment contexts does not apply to Title VII's anti-retaliation provision. *See Muldrow*, 601 U.S. at 354–55, 357. Instead, the Court left undisturbed its previous holding that "the [anti-retaliation] provision applies only when the retaliatory action is 'materially adverse,' meaning that it causes 'significant' harm." *Muldrow*, 601 U.S. at 357 (quoting *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53 (2006)).

*Yoder v. Ohio State Univ.*, 2025 WL 755276, at *9 (S.D. Ohio Mar. 10, 2025) (some citations omitted). *See also Patterson v. Kent State Univ.*, 2025 WL 2630307, at *6 n.8 (6th Cir. Sept. 12, 2025) (explaining that *Muldrow* "did not displace the standard for retaliation claims").

Language on a discipline notice that future infractions "could" or "may" result in additional discipline "up to and including termination," is standard fare for companies that engage in progressive discipline. *C. f. Reeser v. Henry Ford Health Sys.*, 119 F. Supp. 3d 710, 720 (E.D. Mich. 2015) (discussing the employee's attempts to show FLSA retaliation because "she was not treated in accordance with [the company's] progressive discipline policy which should have required the imposition of less serious sanctions prior to dismissal.") In January 2024, both Cazares and Villegas received the least amount of discipline under Tosh's progressive discipline policy, i.e., a "documented verbal warning." In denying Plaintiff's motion for a preliminary injunction, this Court determined that Plaintiff had failed to show that Tosh took an adverse action against Cazares and Villegas because a write-up alone, without some other adverse effect, is not sufficient to constitute an adverse employment action. (Ord. pp. 12-13, ECF No. 37. (citations omitted)).

However, at the time of the hearing, Cazares and Villegas were still employed by Tosh. The question now is whether the disciplinary notices, which were part of a progressive discipline plan, coupled with a later termination, were an adverse action.

For the purpose of deciding this motion, the Court finds that a jury could find that the notices did constitute an adverse action in that the notices were one of the first steps leading to the ultimate termination of Cazares and Villegas. Disciplinary notices that are part of progressive discipline that leads to termination might dissuade a reasonable employee from making a complaint about their wages. *See Edwards v. City of Cincinnati*, 2023 WL 145898, at *3 (S.D. Ohio Jan. 10, 2023) ("Discipline can amount to an adverse employment action if it affects the employee's opportunity for promotion or pay raises or moves an employee forward on a progressive discipline plan."); *Kostic*, 532 F. Supp. 3d at 535 (finding that the plaintiff demonstrated a genuine issue of material fact as to whether certain warning letters and intent-to-discharge letters "built upon" each other and, thus, constituted adverse employment actions, given the employer's progressive disciplinary policy).

Nex, looking at evidence of a causal connection between the protected conduct and the adverse action, a "plaintiff must produce enough evidence of a retaliatory motive such that a reasonable juror could conclude that the [adverse employment action] would not have occurred but for his engagement in protected activity." *Eckerman v. Tenn. Dep't of Safety*, 636 F.3d 202, 209 (6th Cir. 2010).  The Sixth Circuit has recognized that, in some cases, temporal proximity between the protected activity and the adverse employment action may be sufficient to establish a causal connection in a retaliation case. *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 523–26

(6th Cir. 2008).[8] When "an adverse employment action occurs very close in time after an employer learns of a protected activity," temporal proximity alone may satisfy the causal prong of a plaintiff's prima facie retaliation case. *Id.* at 523–25. In those "limited" and "rare" cases, a causal connection between the two actions can be inferred without other evidence of retaliation. *Id.* "But [when] some time elapses between when the employer learns of a protected activity and the subsequent adverse employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality." *Id.* at 525. However, temporal proximity alone is not enough "to establish the prima facie element of causation …. when an intervening act disrupts the purported causal chain between a protected act and an adverse employment action." *Wingo v. Michigan Bell Tel. Co.*, 815 F. App'x 43, 47 (6th Cir. 2020.

The timeline here is as follows. Cazares made a complaint about her pay to DOL in February 2022. DOL's Wage and Hour Division conducted an investigation, ultimately determining that Tosh Farms had violated the regulations governing the H-2A visa program in several ways.  In September 2023, the Wage and Hour Division provided Rosa with a document summarizing the back wages owed to the affected employees, including Cazares and Villegas. The Wage and Hour Division also assessed civil penalties and ordered Tosh to make repairs to the workers' housing.  In addition to her DOL complaint, Cazares complained to Rosa about her pay in October and December 2023. Cazares and Villegas received disciplinary write-ups in January 2024.

In *Nguyen v. City of Cleveland*, 229 F.3d 559, 567 (6th Cir. 2000), the Court found that a one-month gap between a complaint and alleged retaliation, such as in the present case, could not,

---

[8]  *See*, *e.g.*, *Pettit v. Steppingstone, Ctr. for the Potentially Gifted*, 429 F. App'x 524, 533 (6th Cir. 2011); *Spengler v. Worthington Cylinders*, 615 F.3d 481, 494 (6th Cir. 2010) (finding that temporal proximity alone is insufficient to establish a causal connection for a retaliation claim)

without more, support a causal inference. *But see Herrera v. Churchill McGee*, LLC, 545 F. App'x 499, 501 (6th Cir. 2013) (holding that the plaintiff's termination one month after he complained of racial discrimination to his employer was enough to establish causation).

In this case, even if the one-month time period is sufficient to show temporal proximity, there was "an intervening act [that] disrupt[ed] the purported causal chain between a protected act and an adverse employment action," i.e., the complaints of the co-workers of Cazares and Villegas that they were being harassed which was causing on-the-job stress. Thus, the Court finds that, as to causation, Plaintiff has not pointed to sufficient evidence "to raise an inference that her protected activity was the likely reason for the adverse action." *See Pettit*, 429 F. App'x at 533 (stating that, to establish a causal link in a retaliation case, a plaintiff is required to proffer evidence sufficient "to raise an inference that her protected activity was the likely reason for the adverse action.").

However, even if Plaintiff has established that the issuance of the write-ups constituted an adverse action and even if there is evidence of causation, Defendants have presented unrefuted evidence that neither the write-ups nor the termination of Cazares and Villegas were the result of retaliation by Defendants or were a pretext for retaliation.

As previously stated, under the *McDonnell Douglas* framework, if the plaintiff establishes a prima facie case, the burden then shifts to the defendant to set forth a legitimate, non-discriminatory reason for the adverse employment action. "If the defendant carries this burden, the plaintiff then must prove by a preponderance of the evidence that the defendant's proffered reasons were not its true reasons, but merely a pretext for illegal discrimination." *Adair*, 452 F.3d at 489 (citing *McDonnell Douglas*, 411 U.S. at 802; *Kocsis*, 97 F.3d at 883).

In this case, Defendants' stated non-discriminatory reason for the January 2024 meeting and write-ups was that they had received reports that Cazares and Villegas were harassing their co-workers which was causing stress in the workplace. In support of their stated reason, Defendants have pointed to undisputed evidence in the record that three other employees complained that Cazares and Villegas were badgering and harassing them to engage in a walk-out on January 14. Defendant Rosa's testimony at the hearing that other employees had made complaints about Cazares and Villegas went unchallenged. Moreover, in Plaintiff's response to Defendants' statement of facts (Fct. No. 22, ECF No. 120), Plaintiff does not dispute that Manager Santiago told Rosa that "three employees of Tosh Pork made verbal complaints against Cazares and Villegas for causing stress and disruption in the work environment." "Rosa informed Manager Santiago that if those three employees wanted those issues addressed, each needed to make a formal, written complaint describing Cazares and Villegas' behavior." (*Id.* at No. 23.) Rosa received written statements from each of the three employees. "The employees complained, in part, that Cazares and Villegas had asked the employees not to show up for work on January 14, 2024." (*Id.* at No. 24.)

One of those three employees, Nancy Gonzales made a written complaint because she was "tired and angry of all of [Cazares and Villegas'] whining" and Cazares not "want[ing] to work." (*Id.* at No. 26.) Gonzales made a complaint so that Tosh Pork management could address these issues and "improve the way [Cazares and Villegas] worked." "Gonzales had never before made a written complaint about another employee in her six years working at Tosh Pork." (*Id.* at No. 27.) Despite these undisputed facts, Plaintiff surmises that the disciplinary write-ups were the result of retaliation based on the prior investigation but points to no evidence to support her supposition.

Once the defendant provides a legitimate, non-discriminatory reason for an adverse action, "the plaintiff then must prove by a preponderance of the evidence that the defendant's proffered reasons were not its true reasons, but merely a pretext for illegal discrimination." *Adair*, 452 F.3d at 489. The plaintiff may meet this burden by showing "(1) the proffered reason had no factual basis, (2) the proffered reason did not actually motivate [the defendant's] action, or (3) the proffered reason was insufficient to motivate the action." *Id.* (citing *Cicero v. Borg–Warner Auto., Inc.*, 280 F.3d 579, 589 (6th Cir. 2002)). In the present case, Plaintiff has failed to point to evidence in the record to show that any of these three ways raise a genuine issue of fact as to pretext. Instead, the undisputed evidence shows that Cazares and Villegas were disciplined after three employees made complaints regarding their disruptive behavior.

Even if the Court found that temporal proximity established a causal connection as part of Plaintiff's prima facie case of retaliation (which it did not), that is not enough to raise an issue of material fact as to pretext. *See Pettit*, 429 F. App'x at 535–36; *see also Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 317 (6th Cir. 2001) (holding in the context of the FMLA that "temporal proximity is insufficient in and of itself to establish that the employer's nondiscriminatory reason for discharging an employee was in fact pretextual."

Although Plaintiff has established at least three elements of a prima facie case of retaliation (protected activity and adverse action known to Defendants) and even if she has established the fourth element (causation), she has failed to meet her burden to produce evidence to show that Defendants' stated reason for the adverse action was pretextual. Thus, Defendants are entitled to judgment as a matter of law, and their motion for summary judgment is **GRANTED**. *See Celotex*, 477 U.S. at 322 (holding that the Court must enter summary judgment "against a party who fails

to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial.")

The Clerk is **DIRECTED** to enter judgment accordingly.

**IT IS SO ORDERED**.

**s/ S. Thomas Anderson**
S. THOMAS ANDERSON
UNITED STATES DISTRICT JUDGE

Date:  September 30, 2025.